

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

**JONATHAN JONES**
1831 Berkley Ave
Cincinnati, Ohio 45237

        **PLAINTIFF**

    v.

**CITY OF CINCINNATI,**

C/O Andrew Garth
Cincinnati City Attorney
801 Plum St., Suite 214
Cincinnati, OH 45202

and,

**LAUREN CREDITT MAI** *in both official and
individual capacities,*

C/O Andrew Garth
Cincinnati City Attorney
801 Plum St., Suite 214
Cincinnati, OH 45202

and,

**SHEILA BOND** *in both official and
individual capacities,*

C/O Andrew Garth
Cincinnati City Attorney
801 Plum St., Suite 214
Cincinnati, OH 45202

CASE NO. **1:22CV530**.

DISTRICT JUDGE **JUDGE COLE**

MAGISTRATE JUDGE
      **MAGISTRATE JUDGE LITKOVITZ**

**COMPLAINT WITH JURY DEMAND**

and,

**BRUCE ROSS** *in both official and*
*individual capacities,*

C/O Andrew Garth
Cincinnati City Attorney
801 Plum St., Suite 214
Cincinnati, OH 45202

**DEFENDANTS**

**PART I.**
**Nature of the claims**

1.      Since the 1980's Cincinnati has had an issue with hiring minorities on the police
department and agreed to diversify the department. During the riots in 2001, CPD again decided
to initiate hiring goals to attract more minorities allowing minorities to progress in the selection
process if they were not present for the physical agility test, and to take that portion later.
Minority hiring issues have always been attributed to low turn out and no interest. Often records
requests inquired about on race will not be answered by the City or its police department unless
there is a staffing crisis. Minority recruitment percentages only rise during these times, as for all
other times, minority recruitment is constantly low and have fallen well under the 34% agreed
under the Constant Decree. The City of Cincinnati and its police department show a greater
disparity in hiring Black Americans by making requirements harder for a chance at employment.

2.      With police who are a central organization within the community in which it
servers. The department should reflect the community in which it serves. The hiring practices of
the City helps create a culture of distrust with its minority community. There has never been any
oversight into how recruits are selected, which often leads to very few minorities being selected.
Those selected are not enough to make a difference in the department's diversity and culture,
which is over 70% Caucasian.

3.     The hiring standards for Black men and women are much higher that can produce a lower turnout which produces lower number of minorities within the department.  The low number of minorities then spreads out into the community with higher arrests, uses of force and altercations between the police and its diverse communities. In every essence, Cincinnati aids in the racial dysfunction between its police department and communities due to its hiring practices and disregard for federal and state law. These reasons presented are a pretext for race discrimination.

4.     This lawsuit centers around Plaintiff Jonathan A. Jones, who is a Black American male constantly dismissed five (5) from the process not in line with written policy but the complaint is centrally focused on the fact that he was a selected recruit, dismissed from the attendance of the 110th Recruit Class under peculiar circumstances that implored discriminatory actions to eliminate Mr. Jones nine (9) days before the start of the academy, and in his place, a Caucasian male was selected. Issue that lead to the rescinding of the offer where the fact(s) the Ohio Department of Public Safety LEADS, denied Mr. Jones access to the CJIS database which is a required function of any Ohio Peace Officer. The reason for the denial was a 2005 arrest for a charge of domestic violence, of which Mr. Jones was not convicted, with a record expunged in early 2007. Under Ohio Administrative Code, a denial of LEADS access can only be administered by the criminal justice administrator. (1) Evidence will show that the City of Cincinnati and CPD, did know there was no conviction, therefore no disqualifying criteria under Ohio law, or city requirements. (2) Evidence will show, that CPD purposefully did not send in documents to LEADS that lead to the decision to deny Mr. Jones access. (3) Refused to grant the appeal process outlined in written policy, (4) and used the arrest without a disposition to justify the denial outlined as a violation under Title VII.

5.     This lawsuit brought before the court appears to be discriminatory actions towards the minority community, especially the Black community, in the selection process of Ohio Peace Officers. Both the Ohio Department of Public Safety, the City of Cincinnati, and CPD have engaged in actions that limit and deny minorities the ability to be hired to protect and serve. Statements presented to this court will outline the responsibilities of the City in which the City blames the Ohio Department of Public Safety, Ohio State Patrol LEADS division for the denial of the CJIS database. LEADS is the owner of the database, and, the  Ohio State Patrol governs who is granted access to the national database that is needed to perform the functions of an officer. In response to discriminatory actions on the LEADS side, the Ohio Department of Public Safety will blame CPD for not initiating the appeal process under their 5.12 Security Policy.

6.    If it pleases the Court, Mr. Jones has filed suit against the Ohio Department of Public Safety in Hamilton County under A2201861, answered by the Ohio AG office. Mr. Jones is looking at his options of a federal charge since his Right-to-Sue came after this court filing.

## PART II.
## Jurisdiction and Venue

7.    Pursuant to 28 U.S.C. 1331, this court has original jurisdiction over Plaintiff's claims made under federal law because those claims constitute a civil action arising under the Constitution, laws, or treaties of the United States.

8.    Pursuant to 28 U.S.C. 1367, this court has supplemental jurisdiction over Plaintiff's blame made under state law because those claims are so related to the claims made under federal law that they form part to the same case or controversy under Article III of the United States Constitution.

9.    Pursuant to 28 U.S.C. 1391, this court is the appropriate venue because the Souther District of Ohio is the judicial district in which a substantial part of the events or omissions given rise to the claims for relief occurred.

10.    Pursuant to Rule 82.1 of the Local Civil Rules of the United States District Court of the Souther District of Ohio, the Western Division at Cincinnati is the appropriate division because it serves the counties in which a substantial part of the events or omissions given rise to the claims for relief occurred.

## PART III.
## Parties

11.    Plaintiff Jonathan Jones ("Plaintiff Jones" or "Mr. Jones") is a natural person who is a resident of Hamilton County, Ohio. Mr. Jones applied in the 2019 to be a City of Cincinnati Police Officer, accepted to attend the academy but was denied the appeal process after Ohio State Patrol denied access due to an fourteen (14) year old arrest in 2005 that resulted in expungement in 2007, restoring all rights to Mr. Jones. This prevented Mr. Jones from attending the 110th Recruit Class.

12.    Defendant City of Cincinnati is a municipal corporation located in Hamilton County, Ohio. Its Division of Police is one of its departments tasked with providing safety services to the city.

13. Defendant Lauren Creditt Mai ("Defendant Mai") is a natural person who is a resident of Hamilton County, Ohio. Defendant Mai was, at all relevant times, an employee of the City of Cincinnati. She was a City Solicitor and submitted information on behalf of Cincinnati to the EEOC justifying initial dismissal.

14. Defendant Shelia Bond ("Defendant Bond") is a natural person who is a resident of Hamilton County, Ohio. Defendant Bond was, at all relevant times, an employee of the City of Cincinnati. She was the TAC (Terminal Agency Coordinator), in her role, she serves as the agency point of contact on matters relating to access to FBI CJIS systems for Cincinnati Police Department. She was also a contributing decision maker on whether Mr. Jones would be hired as a Cincinnati Police Officer.

15. Defendant Bruce Ross ("Defendant Ross") is a natural person who is a resident of Hamilton County, Ohio. Defendant Ross was, at all relevant times, an employee of the City of Cincinnati. He was SMA Personnel Management for Cincinnati Police. He was also a contributing decision maker on whether Mr. Jones would be hired as a Cincinnati Police Officer.

## PART IV.
### Facts
### Plaintiffs' Race and Background

A. Mr. Jones is a Black American man.

B. Mr. Jones served in the Navy Reserve as a Seabee from March 2005 to February 2017. He was honorably discharged (exhibit A).

C. Mr. Jones attended OPOTC (Ohio Peace Officer Training Commission) Scarlet Oaks Police Academy for Private Security Firearms Training, affirmed by the Ohio Attorney General in both 2010, and 2013 (exhibit(s) B & C ) when Mr. Jones let certification elapse.

D. From 2014 until 2019, Mr. Jones had been employed as an ODRC (Ohio Department of Rehabilitation and Corrections) Officer for five (5) years of service and worked within a state ran database.

E. Mr. Jones was a seven (7) time applicant, who broke his ankle and leg in 2000 at the practice site located at Lunken Airport. He was an applicant for CPD during the riots, unable to run due to limitations of his injury and rehab.

F. Mr. Jones applied for police recruit in 2005, around the same time he enlisted in the service, where he passed his lie detector test but was dismissed for the admission of trying marijuana for first time in 2001. Policy then was one year prior to application, unspoken rule was three (3) years to application. Mr. Jones had four (4) years to application. Arrest record was not a factor in dismissal.

G. Mr. Jones applied for police recruit in 2007 and was dismissed for employment record, not consistent with written policies. According to Mr. Jones' a termination in 2001, in which documentation was provided to CSC, showing Unemployment documentation of unjustified termination after company tried to deny compensation. Termination for driving under Panera Rules as a truck driver that pointed a driver for any accident even if not at fault, this was not reflected on drivers license. The City's insubordination policy does not cover the issues of Mr. Jones' employment then, however he was dismissed from consideration after passing lie detector test again. Arrest record was not a factor for dismissal.

H. Mr. Jones again tried for the 108th Recruit Class, and after passing lie detector test was not contacted any further. Upon calling and requesting explanation, it was told to Mr. Jones that even though he described the arrest and put disclosed the disposition he was not neither dismissed or confirmed since he did not write down the arresting charge.

I. Mr. Jones again tried out for the 109th Recruit Class. He was not selected in the beginning. Mr. Jones was called by Sgt. Dominic Gulliford of Background and Recruiting January 2, 2019, (exhibit D) for position to try out for alternate spot for academy start date of January 14, 2019. Mr. Jones and two (2) others went for openings. At the time CPD was unsure if they were taking one or two of potential candidates. Mr. Jones was the only minority. One member failed out of physical test, and only one candidate was taken and it was not Mr. Jones despite filing out city W-2 forms and all other relevant documentation for hire.

J. Mr. Jones applied again for the 110th Recruit Class since he was the last to go, theoretically he would be the first to be selected. Mr. Jones improved his test scores and was 34th on the legibility test after taking March civil service exam. On June 26, 2019, Mr. Jones was dismissed from consideration due to violations under II. Offenses for a misdemeanor arrest (exhibit E ).

K. Mr. Jones filed for the appeal process and was granted the appeal on August 15, 2019, in which CPD did show up, with Sgt. Gulliford at the table. Mr. Jones explained to the Civil Service Commission (CSC) that he was an alternate considered six (6) months prior and passed all portions of his background. He also copied court documentation of his expungement for the June 2005 arrest granted in February 2007. According to conversation, Sgt. Gulliford made the statement that Mr. Jones was being "too candid" on his PHQ and offered more information than needed. There were no objections to his reinstatement. Mr. Jones was reinstated back into the process that day (exhibit F).

L. Mr. Jones finished all other portions of his background, including medical, lie detector, interview, psychological exam and was offered a position into the academy starting December 2, 2019.

M. During November 2, 2019, police recruit orientation, it was told that recruits had to earn their spot and that officer was not guaranteed. However those who were not alternates had secured their positions unless it was relinquished to an alternate who sat at the back table. During orientation, a request for LEADS access was given, which contained the usual questions similar to that of the PHQ. It requested race, age, and if there were any arrests of domestic violence or a charge that resulted from a domestic violence. Mr. Jones answered the exact same way in his PHQ for consecutive years. He notified that LEADS that he was arrested in 2005, but a plea deal was offered in lieu of trial, which he took. He notified LEADS that his record was expunged and not sealed in 2006 or 2007.

N. November 14, 2019, Mr. Jones received an email that access to the database was denied by LEADS due to disqualifying arrest in violation of security policy 5.12 for a Serious Misdemeanor conviction under (OO) (exhibit G). CPD rescinded his offer, a day after Mr. Jones worked his last day for ODRC, in preparation for the academy.

O. Mr. Jones followed the same protocol as all emails of dismissal were from Mr. Ross and Kelsey Braido. Mr. Jones also contacted CPD Background and Recruiting Officers to no avail. Not a single officer responded to Mr. Jones as he knew the 5.12 Security Policy that an appeal is only granted from a criminal justice administrator outlined in OAC 4502.

P. Mr. Jones was given a date to attend the November 21, 2019, CSC hearing again for exact same reason of an arrest record that was supposed to be expunged (exhibit H).

Q. During that hearing Mr. Jones had a CPD representative who refused to give his name, sit next to Mr. Jones and denied him the appeal process, therefore forcing CSC to follow Ohio rules and deny Mr. Jones reinstatement for the second time (exhibit I).

R. Mr. Jones filed an EEOC investigation into both OSP and CPD for discrimination. OSP complaint was sent to the DOJ for review and was recently answered granting a Right to Sue due to time lapse of greater than 180. EEOC dismissed the initial filing after, Mr. Jones' investigator claimed Mr. Jones was in fact guilty of a serious misdemeanor domestic violence. Errors and problems of that investigation lead to the EEOC granting Mr. Jones the Right to Sue on July 7, 2022.

## PART V.
### Arrest History

16. Looking at Appendix P, Cincinnati 2017 Police Recruit Disqualifying Criteria; Collaborative Agreement Refresh document (exhibit J, 6 pages) and whether this document is legally binding, the belief is in the affirmative. The five (5) page document outlines policies

within the Ohio Revised Code and Ohio Administrative Code, which are the general laws of the state of Ohio. In no way can this document be construed as guidelines and non-enforceable.

17.     According to Section I. Offenses Prohibiting Career As A Cincinnati Police Officer, Mr. Jones has not violated ORC, OAC or, City of Cincinnati policy that would be disqualifying. The City of Cincinnati claims that under (C), they were justified in assistance in denial due to decision making of LEADS and upheld the dismissal for violation of (OO) Chapter 4501: 2-10-01, which are classified as Serious Misdemeanor M1 offenses. Mr. Jones does not have a transgression of a Serious Misdemeanor, of the first degree, nor did he produce any statement that suggested that he was guilty of a crime categorized as an M1.

18.     The wording "offense" which has been misconstrued and misused as an offense defined is not the arrest but the conduct that violates and is punishable under criminal law. Since Mr. Jones was not convicted of a M1, then it is incorrect to apply an M1 conviction based on the arrest alone. The actions of the City of Cincinnati during the first EEOC request, the City responded with portions of written statements from Mr. Jones' polygraph test. Also presented as evidence was his BCI arrest report and admissions of what transpired that day on June 2005. The BCI report sent to the EEOC was incomplete, with no JUDICIAL portion, and had a footnote stating NO DISPO or no disposition. Although, according to the then BCI report, it had the case number, when entered, would provide a *"Not Found"* result. According to BCI, the arrest record could not be used to deny a job and would result in a nondisclosure of arrest. However, the City of Cincinnati produces this as one of their justifications for not granting the appeal process. By their actions, CPD and the City of Cincinnati agreed with LEADS on the arrest alone, even though Mr. Jones produced court documentation left with the Civil Service Commission that was to the contrary.

19.     The burden now lies in whether the denial of the appeal and the justifications used to show non-discriminatory action were, discriminatory whether intentional or unintentional. It has already been established that the arrest of Mr. Jones was used as justification. According to the EEOC Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII, an arrest record is not grounds for exclusion. In the response, the City did not claim the decision was based on the conduct underlying the arrest that would have made Mr. Jones unfit for the position of police recruit; it was simply the arrest alone. Cincinnati Police have hired many with arrests for OVI. While OVI's are not disqualifying, neither is a charge of disorderly conduct if older than three (3) years before application, especially if expunged.

20.     Time of elapse and the gravity of the conduct was not considered by CPD or the City of Cincinnati. The arrest occurred July 17, 2005, following a not guilty plea to the arresting charge. Mr. Jones was offered a plea deal for disorderly conduct from the prosecution in place of a possible lengthy trial and to keep the Navy from finding out about his arrest, which may have hampered his reserve status. Mr. Jones was told after a year, the prosecution would remover the complaint. On February 1, 2007, via mail, Mr. Jones was sent the document that listed ORC 2953.52 as the code. No fee is required for expungement of the disorderly conduct, if not found guilty of crime.

21.     From the arrest date of June 17, 2005, to the second CSC hearing on November 21, 2019, where Mr. Jones was unrighteously denied the appeal process was a timeframe of fourteen (14) years, four (4) months, and five (5) days. Based on the fact that Mr. Jones was an alternate called January 2, 2019, and finished portions of the process to fill vacant spots for the 109th academy with a start date of January 14, 2019, it calls into question how Mr. Jones passed his background for both the 109th and 110th recruit class; if the circumstances of the 2005 arrest were so severe. Examining the *"Green Factors,"* in *Green v. MISSOURI PACIFIC RAILROAD COMPANY, 381 F. Supp. 992 (E.D. Mo. 1974).* The exclusion was inconsistent with *"business necessity,"* as the denial of LEADS strictly denies the usage of a computerized database. Therefore, the City of Cincinnati held justifiable in the affirmative by not granting the appeal process and producing evidence to justify the denial upholding the belief that Mr. Jones is ineligible to operate a computer.

22.     Under Ohio Law an "eligible offender" is 1) "Anyone who has been convicted of one or more offenses in this state or any other jurisdiction, if all of the offenses in this state are felonies of the fourth or fifth degree or **misdemeanors and none of those offenses are an offense of violence** or a felony sex offense"; or 2) "anyone who has not more than two felony convictions, has not more than four misdemeanor convictions, or, if the person has exactly two felony convictions, has not more than those two felony convictions and two misdemeanor convictions in this state or any other jurisdiction."

23.     According to offenses of violence, *ORC 2901.01(A)(9)* a 2919.25 domestic violence, a misdemeanor of the first degree, is not eligible or precluded from expungement and sealing. Surely the law department of the City of Cincinnati knows this; however still submitted information containing statements of expungement with inaccurate and incomplete arrest data to the EEOC for justification of the dismissal. Both agencies from, CPD to OSP, know of this law, however, the law did not apply to Mr. Jones.

24.     With this said, the City of Cincinnati and its police department should have known about the relevant laws that govern relief. According to the EEOC, arrest records should be treated differently than conviction records. The fact that Mr. Jones' BCI arrest report contained the arrest with no judicial and the note of no disposition on an arrest over 14 years in length should have been sufficient enough as proof that there was no conviction of an M1 misdemeanor.

25.     Looking at an individualized assessment, the facts surrounding the 2005 conduct do not suggest a reason for disqualification. Mr. Jones has no conviction on file, according to BCI. With the age of the arrest, with no further arrests or issues of any kind, it is not feasible for any governmental agency to deduce Mr. Jones is a threat or likely to re-offend. Evidence of similar work performed includes being an honorable discharged United States Navy Seabee (3/05-2/17). Armed security officer (2010 & 2013), which requires OPOTC (Ohio Peace Officer Training Commission) certification (2010 & 2013) to carry lawfully for employers granted by the Ohio Attorney General. Corrections Officer for ODRC (Ohio Department of Rehabilitation and Corrections) (2014-2019), where he worked within a state correctional database called DOTS. Employment history shows eligibility for the police academy since Mr. Jones attended portions for certification. Therefore, employment history shows no reasonable justification in the denial of granting the appeal based on information already collected by CPD that showed the opposite of LEADS assertions.

26.     The argument from the City of Cincinnati that LEADS owns the database and makes the final decision is moot and irrelevant on the sole basis for the hearing being denied. Had CPD and the City of Cincinnati granted Mr. Jones another hearing just as the first time, the burden by Cincinnati would have been satisfied even if LEADS would have denied CJIS access. Located on page 2 of the 2017 Collaborative Agreement Refresh, Cincinnati Police Recruit Disqualifying Criteria, the sentence, *"An appeal process is available anytime there is a denial of access to work on/within RCIC/LEADS."* The wording, *"available anytime,"* needs to be clarified. Some argue that there is no promise of an appeal; however, the written statement can be construed as something to be given. The definition of available is defined as, "able to be used or obtained; at someone's disposal." The definition of any time is at whatever time. It is highly reasonable for a person to read such a sentence and believe that, 'An appeal process is able to be obtained at your disposal at whatever time there is a denial of access to work on/within RCIC/ LEADS.' In this, the City is giving prospects who were denied the ability to have access a chance since, according to the LEADS Security Policy 5.12, an appeal is **only granted by a criminal justice administrator**. According to the first response of the City of Cincinnati to the EEOC, the

City was untruthful by claiming that Mr. Jones was responsible for initiating the appeal beyond what was already done in acknowledging he would appear.

27.     The 2017 Disqualifying Criteria (exhibit J) and the availability of an appeal falls under part of the Collaborative Agreement section IV. Purpose of Settlement Agreement, all four (4) goals are being violated, with a particular emphasis on Hiring Practices and Accountability of CPD. If the appeal process is unavailable, it is rightfully questioned why that statement is written in the first place, as it serves no purpose. It is highly suggestive that there have been problems before with LEADS and using arrest records alone to deny Black Americans and possibly other minorities, which the City has used to limit hiring minorities onto the department. This argument is not without merit as it sits before the court for consideration based on facts and actions of the City of Cincinnati.

28.     According to CPD, members of the Cincinnati Council, the appeal process discussed in this document is unavailable and has been replaced with a *"vouching"* system in place of court disposition and fairness to be heard. This system requires the Chief of Police to vouch for a person; who was arrested for maintaining or gaining access to the database. According to the laws of Ohio, the rules outlined in the ORC and OAC, in retrospect to the functionality of Ohio Police Departments, allow the granting and maintaining the duties of an Ohio Peace Officer. Working Officers cannot violate the rule of law only to be overruled by the Chief of Police, as the Chief holds no jurisdiction other than enforcement of the laws. Arrested officers, if arrested for a disqualifying offense, are not found guilty of that disqualifying offense; the disposition is sent to LEADS, where it is asked if the Chief of Police will retain that officer for employment. If there is no disqualifying offense, then there is no justification for termination based on the relevant facts of the arrest.

29.     The mere placement of this section in the Collaborative Agreement, with the hiring of a consultant to serve the City and to aid in the acceleration of efforts for systemic reforms, is indicative of a city past and present making claims for racial harmony amongst its citizens and police department. Questioning the intentions of the City of Cincinnati in their efforts to create a police department that fits the racial makeup of the City is rightfully placed. Mr. Jones contends that the City and its police department violate rules designed to maintain a community-based department based on community demographics. Dismissing a member of its protected class who legally is eligible for a police academy who should have been given the rights as every other person, and under Ohio law, all rights restored after expungement; clearly sends a different message on equality and fairness.

## PART VI
### Similarly Situated

30.     Mr. Jones met the expectations of the Cincinnati Police Department since he was an alternate in the 109 recruit class the same year before being selected for the 110th recruit class. Mr. Jones was the last to be chosen and hypothetically the first to be considered. Mr. Jones had no arrests before the three (3) years required for a misdemeanor disqualification under II. Offenses (B) or any other crime listed in the disqualifying criteria. Mr. Jones, a qualified candidate, had his offer rescinded, and he was replaced with a White male. For this, it sets the tone for prima facie.

31.     Emails sent from Cincinnati's Human Resources staff Bruce Ross and Kelsey Braido (exhibit(s) K & L) show the notification to apply for the appeal process. Mr. Jones responded by requesting an appeal within the time frame of Human Resources. Mr. Jones followed the same method as two (2) other recruits who were disqualified from the recruitment process. Of the three (3), Mr. Jones was the only candidate that had all of his background completed without fail and the only minority. According to CSC (Civil Service Commission) BoardDocs itinerary for November 21, 2019, meeting,

- Ryan Berumen a Caucasian Male, was dismissed under action 15.07 and requested an appeal of his disqualification for medical issues. Mr. Berumen was able to present his argument and was given a chance with Cincinnati medical staff present. He was granted the opportunity for an appeal, and Mr. Jones was not.
- Jeremy Theetge a Caucasian Male, was dismissed under action 15.01 and requested an appeal due to issues with his phycological evaluation. Mr. Theetge was able to present his argument and have input into his case with Background and Recruiting Officer Donita Barnes and Larry Borodin, the Vice President of PRADCO, who were present at the meeting. He was granted the chance for an appeal, and Mr. Jones was not.
- According to Orientation Squads (exhibit M) given to Mr. Jones when he attended the orientation, his name and Berumen's are listed on the sheet. Mr. Theetge's name is not listed, and it is speculated that Theetge was on the alternate list, and if so, it is questioned as to why an alternate was given better treatment than Mr. Jones who was not an alternate.
- Jonathan Jones under action 15.03, was not represented. The person who sat next to Mr. Jones refused to identify himself and told CSC that he was the CPD representative. The unnamed representative stated, *"We know Mr. Jones is coming, but you cannot make us take him. We already have someone in his place."* All of the alternates were White males. At that point, it was apparent that a Caucasian male had replaced Mr. Jones before the hearing. Mr. Jones' statement written to LEADS on the arrest was the same as his PHQs for the 108, 109, and

110th classes. The information briefly explained the arrest and expungement in 2006 or 2007 exactly verbatim just as Mr. Jones had wrote (exhibit N). According to the unnamed individual, he stated that *'there was no legal obligation to represent Mr. Jones as he was not an employee of the city.'* In other words, Mr. Jones was being treated as an arrested employee with no conviction, and the Chief decided to terminate employment for the unrepresented union individual. Mr. Jones, not being an employee, is not subjected to the *"vouching"* as the Chief cannot vouch for his character. The City of Cincinnati's stance was under no obligation to represent Mr. Jones. According to the LEADS security policy, wording under the 2017 Collaborative Agreement Refresh with the appearance of an action to be given under specific circumstances. It illustrates CPD should have stood by their policies, Ohio law, and their investigation to the detriment of taxpayer funds, with three (3) years of consecutive background checks on Mr. Jones. The City and police department were obliged to initiate the appeal outlined in LEADS Security Policy 5.12.

- According to CSC, the denial stood, even though the same information was presented three (3) months and six (6) days prior to Mr. Jones being reinstated into the process, for no disqualifying criteria. On that date, Mr. Jones left in CSC possession a copy of his expungement granted by Hamilton County Court dated February 1, 2007. It is a high concern that the City heard Mr. Jones' argument and determined that there was no legal justification to deny re-entry into the process. Then, months later, it reverses its stance in contradiction with the rule of law.
- The city of Cincinnati in written response to the EEOC why the appeal was not granted the second time, the City claimed that Mr. Jones was not given an appeal because he did not initiate the appeal. It is not understood, as Mr. Jones' name would not have appeared on the docket for the November 21, 2019, CSC meeting if no appeal was requested. The fact is, that Mr. Jones followed the same protocol as before for his first dismissal. LEADS security policy clearly states in the OAC that an appeal has to be administered by a criminal justice administrator. It is also documented on the LEADS denial letter sent to Mr. Jones that was sent to him by the City of Cincinnati's Bruce Ross Human Resources Coordinator.
- Mr. Jones recalls a different treatment given to him, unlike the other two prospected recruits. Mr. Jones recalls seeing officers from the academy stand around Mr. Berumen. He was greeted with handshakes and conversation. Mr. Jones recalls being off to the side and not being approached by a single CPD academy personnel or officer outside the academy. At one point Mr. Jones recalls trying to get the attention by waving in which heads turned the other way.
- Inside the hearing Mr. Jones recalls hearing Jeremy Theetge's name called first and he was not present in the room. CSC decided to come back to him and called Mr. Jones first. What is

concerning for Mr. Jones and his treatment was that according to City Hall sign in records, Jeremey Theetge signed in before Mr. Jones and was at City Hall before Mr. Jones was. Mr. Jones did not recall seeing his recruiter, Officer Donita Barnes, who sat with Mr. Theetge and is named on the BoardDocs itinerary for the November 21, 2019, hearing.

32.     It is rightfully questioned, why Mr. Jones was not granted the appeal process if others were granted the chance, regardless of outcome. The claim that Mr. Jones is not similarly situated due to the reasons for appeal is not a valid argument. Mr. Jones should have been able to address LEADS as the City gave the impression of an appeal whenever there was a denial. According to Ohio law, what would govern the hiring of officers is the same for retaining officers. If that is the case, then Mr. Jones was not violating the City hiring policy outlined in the 2017 handbook and should have been granted his appeal. For this, it is believed that there is merit in prima facie for hiring discrimination by the actions of CPD and the City of Cincinnati for limiting the number of minority recruitment.

## PART VII.
### Past Present and Future DV arrests
### Similarly Situated

33.     It will be up to the court to decide on similar situated when it comes down to whether or not Mr. Jones is similarly situated not in the job duties, title, probationary vs non-probationary. But whether the ORC and OAC that governs retention of officers employed  are treated the same/similar as a person requesting to become an officer.  Violations outlined in the 2017 Disqualifying Criteria are the same violations that if a current officer is guilty of, the duties of that officer cease.

- For example, Mr. Jones stated that he was arrested for domestic violence, a disqualifying offense, if convicted of that offense. Mr. Jones goes to court and is not found guilty of the disqualifying offense but takes a plea to a lesser charge of a low level misdemeanor or has the complaint removed by the court. The disposition is not disqualifying therefore Mr. Jones is eligible under Cincinnati policy and the state of Ohio.
- A Cincinnati officer is arrested for a domestic violence, a disqualifying offense, if convicted of that offense. The officer takes a plea deal to a lesser charge of a low level misdemeanor. The disposition is not disqualifying therefore the officer is eligible under Cincinnati policy and the state of Ohio to retain job.
- Differences in treatment is that the minority applicant is denied being treated as the officer(s) in the application of the law. If Mr. Jones is in violation, then any current officer with the same

arrest is in violation. If officers arrested for a disqualifying offense are not guilty of that, then Mr. Jones is not guilty of that.

### CPD Officers Arrested

• 34   CPD Officer David Dozier arrested on September 28, 2015, for domestic violence **(exhibit O)**, allegedly punching his fifteen year old son in the stomach and knocking out a toot with a left hand print visible on child's face according to the report. Officer Dozier held on a bond amount of $2500 under case number 15/CRB/25743 still visible in Hamilton County Clerk of Court docket search. Officer Dozier was convicted by plea of a disorderly conduct charge, which is not disqualifying. Officer Dozier retained employment after incident and is still currently working as a CPD officer. Officer Dozier did not violate CPD policy or any Ohio code that would prevent him from retaining job or applying.

• 35   Arrest of CPD Officer J.S. (name not disclosed due to not guilty ruling), arrested November 2, 2019, for domestic violence under case number 19/CRB/27274 **(exhibit P)**. Jury trial resulted in acquittal on February 5, 2020. Application for expungement presented on February 7, 2020. Arrest is no longer visible in Hamilton County Clerk of Court docket search. Rightfully so, Sgt. J.S. did not violate CPD policy and retained his job.

• 36   CPD Officer Rose Valentino arrested on March 26, 2020, for domestic violence, assault and criminal damage resulting from a fist fight with her sister and other individuals. In Butler County Area Court 1, CRB2000279 **(exhibit Q, 6 pages)** is still visible. On March, 23, 2020, all charges were merged and Officer Valentino was able to plea to a charge of a disorderly conduct. Her disposition was amended from domestic violence M1 2919.25; 2 yrs good behavior; AM prog ordered. Under the laws of Ohio and the policy of CPD that mirror Ohio Law, Officer Valentino was eligible to keep her job and did not violate CPD policy.

• 37   CPD Officer Wendell Davidson arrested on , July 12, 2020, for domestic violence **(exhibit R)**. On August 31, 2020, Officer Davidson was convicted by the court of domestic violence M1 2919.25. Under CPD and city Rule 1.02(B) of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Department, which states:

> 1.02 Member shall obey all laws and ordinances.
> B. 1st through 4th degree misdemeanor traffic law or criminal law conviction.

38.    Even though Officer Davidson resigned, a conviction of M1 domestic violence carries a weapons disability, disqualification from work as a police officer under Ohio Law. CPD and the city acted accordingly within the law. Mr. Davidson would not fit under the *"vouching system"* because there is a conviction of disqualifying code mandated by the state of Ohio. In this aspect, it again places the seeking recruit on the same lever as the currently employed. The seeking and the employed are subjected to federal law that imposes a weapons disability for misdemeanor domestic violence convictions. This is defined in 18 U.S.C. 921(a)(33)(i) as a misdemeanor under Federal, State, Tribal, or local law.

39.    Additionally, 18 U.S.C 922(g)(9) prohibits a person convicted of a misdemeanor crime of domestic violence from shipping, transporting, possessing or purchasing any firearm or ammunition for life. This carries a *"firearm disability."* Neither the applicant or the employed would be able to perform the duties of an Ohio Police Officer with a weapons disability, thus preventing the hiring or retention under law. In this instance it is claimed that this is a similarly situated situation as the law takes precedence over the classification of job duties.

40.    Arrest of recruit Jonathan Jones, July 6, 2005, for domestic violence. Mr. Jones plead not guilty but was convinced to take a plea deal of disorderly conduct. Based on the arrest circumstances, Mr. Jones was told a year after his arrest that it would be removed under an expungement under 2953.52 and not a sealing of record under 2953.32. Case number 05/CRB/ 21729 is not visible in Hamilton County Clerk of Court and has not been since February 1, 2007, the date of complaint being removed. According to BCI, Hamilton County did not send paperwork on the expungement. Pursuant to 109.57(E)(2), BCI is authorized to provide only information relating to criminal convictions and guilty pleas. Mr. Jones provided the same court documentation presented to CSC and requested a criminal history record check. Criminal History Record Check, Authentication No. BMT501776631 dated October 2, 2020, came back with "No Convictions On File" (exhibit S). Prior to that, there was no convictions noted on the BCI record as there was no judicial and no disposition of the 2005 arrest.

41.    The issue is not whether Mr. Jones has a 2953.32 or 2953.52, from a disorderly conduct disposition, the issue is that the application of the state and federal law and city policy are not demonstrated in this issue, as Mr. Jones did not have his rights restored and convicted by opinion and prejudice over the rule of law. At the time of application, Mr. Jones is just as responsible for his actions as the officers listed above. Suppose Mr. Jones did not violate what was written in the 2017 Disqualification Criteria, also referred to in the ORC and OAC that is

mirrored in the CPD Manual of Rules. In that case, it is not feasible to assert that Mr. Jones at this point is not similarly situated when it comes to applying the law.

42.     Request number 145773 submitted to CPD records by Mr. Jones for information on,

*Whether any Cincinnati Police Recruit has been arrested for any misdemeanor charge prior to the start of academy. Disposition of the arrest is not required. Information is also being requested on the arrest of any CPD officer currently working after an arrest charge of a domestic violence, or worked but left the department voluntarily, without disciplinary action. Same for an arrest charge of an assault. Timeframe of the request is 2015 to present.*

43.     CPD only disclosed Officer Davidson. By not submitting any of the above officers, with exception to Sgt. J.S., it can rightfully be assumed that CPD does not consider those officers arrested despite actually being arrested with continued employment. This also suggests that city does not track or keep record of recruit data as suggested to Mr. Jones by then Human Resource Manager, Bruce Ross of the police department by not providing any kind of information on arrests of recruits hired by the city. The nondisclosure could also indicate that the city and its police department do not want to disclose a possible disparity.

44.     Speaking with various members of the city of Cincinnati on the problems concerning discriminatory actions within the hiring system, it has been touted that Mr. Jones is not *"similarly situated"* in applying the law and city standards compared to the three (3) officers mentioned. This sentiment is disagreed, as the laws implied here are impartial. If the applicant is convicted in court of an offense under Chapter 2919, that applicant is ineligible for the duties and will have certain penalties associated with the conviction. The lack of understanding that the same laws applies to those officers currently working, as they would be unable to continue performing their duties due to certain penalties associated with the conviction. Here, there is grounds for similarly situated as the written law is what ties everyone together. Suppose CPD policies allow officers to retain employment after a court hearing with a disposition of a non-disqualifying charge. In that case, the applicant should not be disqualified from consideration under similar circumstances.

45.     Placing such a burden on the plaintiff, to have every aspect similar. From having the same supervisor, with the same issues, from the same duties, non-probationary vs. probationary, in this instance is like tipping the scale in such a way that would equate to an anvil placed on that scale. If the court limits and narrows the focus for treatment to be the same, then

this will aid the City and CPD to explain any differences in treatment and leave the door open for any minority arrested ineligible for consideration of hire regardless of the disposition, as presented in this case.

46.     Mr. Jones wants to remind the Court, that this is the sole reasoning alone to why this case is being presented Pro Se. The burden of surviving the narrow focus on similarly situated is great. While legal professionals all agree that there is wrong doing with discriminatory actions present, the narrow focus on similarly situated leaves Mr. Jones to fight for the rights of any other minority seeking employment with the City of Cincinnati. It has been made clear that a higher standard is placed upon the Black community to be hired. The possibility for continued hiring discrimination will be allowed under the guise of the law.

47.     If it is feasible, the court may need to expand its focus on similarly situated in this matter. This could potentially be a foreseeable issue that would allow continued hiring issues to arise with using arrest records without conviction. Or the denial of the complete appeal process. According to EEOC, the nature and gravity of the offense or conduct, the time that has passed since the arrest can be negated simply by keeping a narrow view of similarly situated. Again, the nature of the job is defined under law for retention and continued employment. If the nature of the job allows the employed retention under Ohio Law, then it surely allows hiring under Ohio Law. With that said, Title VII is in jeopardy if the court rules that there is no instances of discrimination as none of these issues were considered. Based on the Seventh Circuit's definition of similarly situated:

48.     The requirement is met *"so long as the distinctions between the plaintiff and the proposed comparators are not 'so significant that they render the comparison effectively unless.'"* In Lewis v. City of Union City the U.S. Court of Appeals acknowledged that, *"all material respects"* must be viewed on a case by case basis, the court sought to provide guideposts for courts-and, by extension employers-about what might constitute *"a similarly situated comparator."* Such a comparator:
- "Will have engaged in the same basic conduct (or misconduct) as the plaintiff;
- "Will have been subject to the same employment policy, guideline, or rule as the plaintiff;
- Will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff";
- "Will share the plaintiffs employment or disciplinary history"; and
- May not have the same title or precisely the same job functions.

49.     Suppose the court is persistent on keeping a narrow focus on similarly situated when it comes down to applying the law. In that case, it justifies actions that can cause a disparity in the hiring process. Mr. Jones respectfully asks for the Courts consideration.

## PART VIII.
### The Vouching System

50.     When an officer gets arrested for a disqualifying offense such as domestic violence. Access is denied and that officer is placed on desk duty awaiting outcome of court depending on the allegations and severity of the issue. Once the court has reached its disposition in the case, LEADS will ask for an update of the disposition and whether or not the department will retain that officer's employment. At this point this is where the vouching system has merit. Based upon the union contract, the details of the incident, whether or not the officer violates the required codes and laws to keep the job outlined by the state of Ohio. Then, the Chief can make the call for retention or termination. In the case of Mr. Jones, the previous two Chiefs of Police could not vouch for what occurred fourteen years ago and how Mr. Jones's conduct was on a professional level. On one end of the spectrum, Mr. Jones was told during CSC hearing that he was not an employee of the City, and was not worthy of the appeal process. On the other end of the spectrum, Mr. Jones was subjected to the vouching system, where union rules, performance of the officer, rules and regulations all play a role in retention of an arrested officer not charged with a disqualifying offense. The vouching system plays no legal role in hiring **non-uniformed** potential officers. It is contended that this is not a valid argument by the City to place Mr. Jones under the vouching system as this only applies to uniformed officers and/or uniformed recruits. Mr. Jones contends that he was hired but was never subjected to the discretion of the Chief because he had not yet been placed under the direction of the Chief.

51.     The vouching system is appropriate for those already hired. What applies to Mr. Jones is that the law says the offense has to be three (3) years if there is a conviction of a misdemeanor or arrest to the application date. According to BCI, what is also applicable to Mr. Jones is that the complaint was removed and that there are no convictions on file. Therefore, Mr. Jones was treated as the lesser.

## PART IX.
### Circumstantial Evidence

52.     A claim that the denial of the right to appeal was not discriminatory, but due to strictly LEADS determination as seen in the three (3) page (exhibit T) response from the Senior Assistant Solicitor, dated May 15, 2020. The claim made on page 2 is questionable.

*"The hearing on this date was not an appeal to the Ohio State Highway Patrol or the LEADS Administrator." "It should be noted, that appeals and appearances for removal from eligibility lists or recruit classes are frequently heard by the Commission. Generally, the City does not represent or advocate for individuals in these appearances as the removals were made at the request of the City."*

53.    The City of Cincinnati contends "That the conditional offer of employment was withdrawn for the simple and non-discriminatory reason that he was denied access to the LEADS database by the Ohio State Highway Patrol." These statements, which were the basis of the denial of the appeal, leave the door open for scrutiny. There is a difference between mistakes or "honest belief" and purposeful, intentional or negligible.

54.    As discussed previously, the 2017 Collaborative Agreement Refresh the wording gives the impression that an appeal was to be given, especially since there was a reinstatement from an appeal process three (3) months to the date of the denial in the same situation. The City's claim that they are not representing Mr. Jones bears no meaning and is an invalid statement. The City did not advocate or speak on behalf of Mr. Jones when he presented facts to CSC during his first appeal and would not have expected the City to support or talk on his behalf since he had the information nobody requested. The only function that the City needed was to initiate the appeal.

55.    According to emails sent from Bruce Ross, SMA Cincinnati Police Personnel Management, to Mr. Jones. The email dated November 14, 2019, at 8:56 am (exhibit L) clearly shows the link for the appeal, and it was requested that Mr. Jones submit an appeal as soon as possible. It should be noted that the link, once clicked takes you to the Civil Service Submit An Appeal page. This contradicts the Senior Solicitor's comments that the hearing was not an appeal. It should be rightfully questioned on the intention of the City and whether there was an "honest belief" of a mistake that could be construed as the City not knowing its policies or process. Or if the actions illustrated show intent or purpose in deciding to place a Caucasian Male more liked or known over Mr. Jones.

56.    It should be rightfully asked of the City to clarify the statement that the *"City does not represent or advocate for individuals in these appearances as the removal were made at the request of the City." Documentation contradicts that statement with Berumen and Theetge.* Circumstantial evidence calls into question the differences in granting the appeal process. As discussed, the intention of the City allowing some to have an appeal process yet to deny another an appeal does not reflect impartiality. In the case of Jeremy Theegte, the Vice

President of PRADCO was requested, but the LEADS Administrator was not. According to CSC BoardDocs, Action: 15.07 Ryan Berumen (exhibit U) *"Kelsey Braido, Senior Human Resources Analyst for the Human Resources Department, presented a letter to the Commission on Mr. Berumen's behalf."* According to the City of Cincinnati,

*"Generally, the City does not represent or advocate for individuals in these appearances as the removals were made at the request of the City." - Senior Assistant Solicitor.*

57.     According to the law department, the City does not actively advocate, back, support, or favor one that meets opposition. However, the City supported Mr. Berumen's request for an appeal by having a letter presented to the Commission and the health department on his behalf. At the same time, it is believed that Mr. Berumen was physically present at the hearing (exhibit V, four pages). The intention of the City does not support that of impartiality if Mr. Jones' removal was at the request of the City and he was the only one denied a chance for any appeal.

58.     Circumstantial evidence suggests that the email dated Friday, **August 30, 2019**, between TAC Sheila Bond and Kara Joseph of LEADS (exhibit W), highly suggests the intentions of CPD since this email was presented to CSC during November 21, 2019, hearing in which CPD refused to initiate the appeal. Contained in the email discussed was a situation of a person who had two (2) arrests with no convictions. A minor misdemeanor is usually approved, according to Kara Joseph. As discussed in this email, the female described was arrested twice, never convicted, and denied access due to the seriousness or totality of circumstances involving a shooting and stabbing of their significant other. In no way is Mr. Jones' whole circumstances comparable to the denied person illustrated. The significance of the date of the email in question is that Mr. Jones was reinstated on **August 15, 2019**, which was fifteen (15) days before the email. Mr. Jones passed his polygraph for 3rd consecutive year on **August 22, 2019**, eight (8) days prior to the email submitted concerning Mr. Jones. Mr. Jones passed his interview process for 2nd consecutive year on **August 28, 2019**. It is not without reason to question the rationality for an email to be used as evidence to deny Mr. Jones the appeal process after he did not fail out of the process once reinstated. From the August 30, 2019, email to November 21, 2019, not a single CPD representative or LEADS administrator requested information on the status of the arrest in 2005. The only governmental body that knew was CSC during August 15, 2019, reinstatement hearing. Fifteen days to conjure up reasoning to replace is not a far-fetched conclusion, considering reinstatement by CSC. According to the response of the Ohio Department of Public Safety, TAC Bond sent a "portion" of information about Mr. Jones to

LEADS. That "portion" of information was in part of Mr. Jones' PHQ discussing the circumstances of the arrest, Golf Manor's Written Police Report on the arrest, BCI record, and part of admission during the polygraph test.

59.     When Mr. Jones opened the email, he recalls making phone calls to various Human Resources and Cincinnati Police Academy personnel members. According to Mr. Jones' recollection, a phone call was placed to Bruce Ross at 513-352-2587 on two occasions at 7:59 am on Thursday, November 14, 2019, where Mr. Jones left a voicemail. Mr. Jones called again at 10:14 am; this time, Mr. Ross answered the phone. After listening to Mr. Jones' voicemail, Mr. Ross could not offer any words other than to appeal and that he had never seen a denial like this before. Phone records show that Mr. Jones called 513-352-2971 to the recruiting office at 10:37 am on November 15, 2019, and left a message for 4 minutes. 513-357-7555 Mike Bell at 2:13 pm on November 17, 2019, and left a message, duration of 1 minute. Mr. Jones left a message on Officer Mandy Vineyard's cell phone and his recruiter, Officer Donita Barnes, after being transferred by the recruiting receptionist. Not one person returned Mr. Jones' call to inform him of anything (exhibit X).

60.     Circumstantial evidence would support Bruce Ross' surprise. Case No. 2:22-cv-00027, Iverson vs. City of Columbus, filed in Ohio Southern District Court on January 5, 2022. Five (5) Caucasian men were granted conditional offers by Columbus Police Department with questionable backgrounds and were granted access by LEADS and are currently Columbus Police Officers the same year Mr. Jones was denied entry and the appeal in 2019. Admissions of but not limited to, stealing, theft, rape allegations, heavy drug usage, drug sales, deception admitted to during polygraph and conviction of an M1 Serious Misdemeanor charge of theft, with jail time served, a violation of (OO)(4) under LEADS Security Policy. While it is evident that there is a severe problem in Ohio, and part of the blame does reside with LEADS, this does not excuse the City of Cincinnati and the issues documented herewith in.

61.     According to the email dated August 30, Kara Joseph of LEADS informs TAC Sheila Bond of CPD that,

*"We do review every single police report and supporting documents on anyone who has been arrested. The LEADS Security Policy 5.12 says that anyone who has been arrested, regardless of conviction, must be sent to LEADS before they are given access to LEADS. However, if it is not on the list in Section OO, it us usually approved if it is a minor misdemeanor...Going back to the LEADS Administrative Rules, Section OO, if the arrest has to do with one of the offenses listed, we would need to see the original police report, if possible.(If the offense is not included in Section OO, we do not usually need to see the police*

*report.) If the submitting agency is unable to obtain the report, we may go on the preponderance of any other evidence provided to use, the time that has lapsed sine the offense, and/or the number of offenses committed."*

62.     When looking at the first paragraph of their conversation, Kara Joseph starts off by writing,

*"If you look at LEADS Administrative Rule 4501:2-10-01 Definitions, Section OO, it will list a number of issues that tend to be denials. I say tend to, because we do understand that charges can be filed against someone wherein the offense does not meet the charge. From example, we had an individual who was in his 40s and had been charged with a felony trespass when he was attending Ohio State. When he was 19, the Shoe was undergoing reconstruction. One side was out and had orange snow fence between the sidewalk and the field...OSU ended up charging him, and he was convicted of a felony trespass. We granted his access."*

63.     According to the response of the Ohio Department of Public Safety in both responses made in under EEOC charge number 532-2020-00549 dated March 9, 2020, and OCRC charge number 48665 dated August 11, 2021, the claim that,

*"On November 13, 2019, TAC Bond sent Ms. Joseph some of the requested documents - a portion of a 2005 police report, a portion of the Charging Party's application with CPD describing that 2005 incident, and a portion of Charging Party's polygraph examination...Neither Charging Party's response in the polygraph nor the records from CPD addressed an earlier arrest that Ms. Joesph uncovered and inquired about. LEADS Administrator John Moore reviewed all documentation and denied access according to LEADS standards based on the police report, polygraph report, arrest in 2005, and earlier incident that Charging Party had not disclosed but which the LEADS team uncovered...In Charging Party's denial, LEADS stated the agency could appeal the decision."*

64.     While there are issues solely directed towards LEADS and will be addressed in that filing of discrimination, the problems with CPD are concerning. The portion of documentation that TAC Sheila Bond Mr. Jones had recently discovered was the information sent to the EEOC by the City of Cincinnati, as well as what was sent to LEADS and used to justify the denial of the appeal (exhibit(s) Y & Z). It was the portion of the police report, part of the application, and a portion of the polygraph. The problem with using a police report over 14 years old is that the record was expunged and never deleted. As we speak, the arrest record is still on file in the Village of Golf Manor since BCI and Hamilton County Clerk of Courts has sent notification to delete the file. The record was deleted in 2007 and never reported to BCI, who kept the arrest on file without a disposition. Once the record was removed from BCI, the Village of Golf Manor found out about the expungement due to Mr. Jones's conversations with GMPD but has not been sent any information to purge the record from their system. Also, the issue of

deep concern is the blood on the lip. According to all eyewitnesses, there was no blood on the lip, which was discussed during the court hearing and disclosed to the prosecutor by Sonya Cradle, Mr. Jones' then-girlfriend. This recollection is absolute because Mr. Jones did not fail his lie detector test or show any deception. The memory of events did not have any blood as there was no blood or busted lip that resulted from a headlock.

65.     In the portion of the PHQ, the court needs to take notice to the bottom right corner, pages 32 of 56. This is the portion of the PHQ taken on May 5, 2019, as indicated in the top right corner. The bottom right corner shows a date of August 28, 2019, the day of the interview, with Mr. Jones' initials JJ, to signify the truthfulness of the statement. According to Ms. Joseph in the email, LEADS understands that the charges can be filed against someone whose offense does not meet the charge. In the description Mr. Jones gave, a discrepancy or bias by both Bond and Joseph is demonstrated. It is not believed that the circumstances of the offense Mr. Jones was arrested for or pleaded to meet the charge as stated by Ms. Joseph in the email. Mr. Jones describes a fourth-degree felony under 2909.04 Disrupting Public Services enacted September 23, 2004, nine (9) months before the arrest of Mr. Jones. Mr. Jones passing his lie detector test would prove that all admissions were truthful and that Ms. Cradle committed a crime under 2909.04. Neither Bond nor Joseph considered this issue. While the actions of Mr. Jones on that day may not have been appropriate, the underlying fact is that Mr. Jones did pass a lie detector without deception on his recollection. It has been proven that he did try to avoid the situation by relocating to other portions of the house. Mr. Jones tried to call non-emergency, his mother, and then 911 when all else failed. What was described was an act of aggression when aggression was placed upon him, especially after being pushed. However, neither Bond nor Joseph considered this, and the totality of circumstances was not applied to Mr. Jones. What is absolute is that Mr. Jones described this event every year: he took a lie detector test for CPD and has never failed or showed signs of deception. This scenario describes Golf Manor Police Department failing to allow Mr. Jones to file charges that day, denying him and placing him under arrest with a similar account of the incident from both parties. The arrest report does not take precedence over the disposition of the court.

66.     According to LEADS, the uncovered arrest Ms. Joseph inquired about was not sent by TAC Bond but is located on page 33 of 56 in Mr. Jones' PHQ (exhibit AA). Due to CPD's retention schedule, the arrest report was deleted after five (5) years in 2008 (exhibit BB). Mr. Jones, in that 2003 arrest, was the victim of a domestic violence incident that led to the dismissal of charges that resulted from a false accusation brought against him by the mother of his child who bit him and hyperextended his finger in an attempt to steal a phone charger. According to

Hamilton County Court case number 04/CRB/17263 (**exhibit CC**) Jonathan Jones vs. Shellay Mills, Ms. Mills was convicted by plea. As of September 7, 2018, the record is unable for sealing or expungement. Mr. Jones disclosed that information, and according to LEADS, Ms. Joseph uncovered it, resulting in the belief that Mr. Jones "lacked candor," as described by the Ohio Department of Public Safety in both documents (**exhibit DD, 6 pages**). In the Ohio Department of Public Safety's last statement, they state (**exhibit EE, 7 pages**),

> *"Cincinnati Police Department had the right to appeal all denials to access LEADS. LEADS has no appeals on file from the Cincinnati Police Department relating to Charging Party..Had circumstances been different-for example, had CPD appeal the determination relating to Charging Party, had Charging Party revealed all the arrest in his background, or had different records been provided to Respondent-then perhaps the result would be different."* (Page 6 August 11, 2021).

67.    According to the portion of the lie detector (**exhibit Z**), Mr. Jones described the situation and, again, disclosed under the circled portion that the charge was disorderly conduct and that his record was expunged in 2006 or 2007. At no point in time did LEADS nor TAC Sheila Bond or CPD Background and Recruiting request court documentation since there was no disposition on the 2005 arrest. Mr. Jones was automatically guilty of a disqualifying conviction without a conviction. Mr. Jones again provided information on the circumstances of the 2003 arrest. This arrest does show the truth in Mr. Jones' assertions as there is no guilt by Mr. Jones, but there is guilt by Ms. Mills.

68.    While LEADS does play a significant role and is not without fault or blame, the intentions of CPD are not reflective of a neutral employer in which race is not a factor. The inconsistencies in the hiring process for Mr. Jones do not suggest fairness, and the assumption that other minorities were hired does not negate the fact that discriminatory actions were prevalent in the decision-making of Mr. Jones. The EEOC clearly states that an arrest record standing alone may not be used to deny an employment opportunity and that an employer may make an employment decision based on the conduct underlying the arrest if the behavior makes the individual unfit for the position in question. The conduct, not the arrest, is relevant for employment purposes. Under the circumstances, by the statements verified by the passing of his lie detector, the behavior of Mr. Jones does not suggest he is unfit for the position of Cincinnati Police Officer or access to a database. Mr. Jones does not have any crimes associated with computers or fraud. All in all, Mr. Jones was a victim of these instances of domestic violence. Due to race and possibly gender, he was chosen to be guilty without any supporting evidence or a conviction.

69.     Circumstantial evidence, also known as indirect evidence, is presumption.

*"Circumstantial evidence can include suspicious timing, inappropriate remarks, and comparative evidence of systematically more favorable treatment toward similarly situated [individuals] not sharing the protected characteristic...." Loyd v. Phillips Bros., Inc., 25 F.3d 518, 522 (7th Cir. 1994); accord Troupe v. May Dep't Stores Co., 20 F. 3d 734, 736 (7th Cir. 1994).*

A single type of evidence does not prove many cases of intentional discrimination. Instead, many different kinds of evidence- direct detailed, statistical, and anecdotal- are relevant to showing intent and should be assessed on a cumulative basis.

70.     While the City may contend that the decision was based on the non-discriminatory reasons based of the Ohio State Patrol, the actions to provide BCI records and admitted statements by Mr. Jones to the EEOC justifying the decision are troubling and suggests an intention instead of a neutral stance or a situation of unfair treatment that would be considered commonplace. Presenting the incomplete BCI record is not in accordance with Ohio Law under ORC 109.57(E)(2), which authorizes BCI to provide only information relating to criminal convictions and guilty pleas that did not show a conviction or any guilt (exhibit FF). This can be viewed as intentional in order to persuade or convince the initial EEOC investigator that there was a record on file, a disqualifying offense. According to Mr. Jones, his investigator called him in September 2020 to inform him that the case was being recommended to be closed because Mr. Jones was guilty of an M1 offense. Mr. Jones sought an inquiry from BCI after that. According to BCI, the arrest record without a disposition was ineligible to be used for any job denial. It was then discovered that BCI was not notified of the expungement in 2007. In all other inquiries from the Navy, ODRC, and all other jobs, BCI did not provide any arrests were made. This shows an abuse conducted by both the Ohio Department of Public Safety and the City of Cincinnati. Once BCI was sent a copy of the court documentation, the arrest was removed from the system. Mr. Jones had BCI run fingerprints in October, which came up with nothing on file. Surely the Law Department of the City of Cincinnati understands when a record could be used in accordance with the law and is rightfully questioning the rationale of such a decision.

71.     If the ORC prohibits such an action, the intention to produce such a document should not constitute a commonplace mistake as the number of mistakes is more than one. If the City were to prove that the decision was strictly due to LEADS determination, there would have been no need to produce documentation to the EEOC in the form of any written statements from Mr. Jones and his arrest record with an arrest containing no disposition and no judicial attached. There would have been no reasoning for producing the email from LEADS to TAC Sheila Bond

on multiple arrest(s) used to connect Mr. Jones to disqualification. Such actions do not suggest neutrality since there was a need to prove a point and justify the denial of the appeal. The biggest issue and the most hurtful to Mr. Jones comes from the fact that Mr. Jones was a victim of a domestic violence issue with false allegations filed against him, used as a reason to deny him an opportunity of the appeal and job.

72.     Also while, employers are generally permitted to use criminal records in their hiring decisions. There are prohibitions against using criminal records as a complete ban on hiring in many situations. For example, the City of Cincinnati cannot deny a person for an arrest when they have officers there with similar arrests and justify the business necessity aspect of the denial to hire. It should be reiterated that Ohio Law specifically outlines who is eligible and the circumstances of that eligibility if there was an arrest by giving a time period before an application can be pursued. Mr. Jones's completion of all requirements and selection calls into question the reasoning and rationality of the dismissal under the circumstances used for denial. Operating outside of the intended language of the law is not in good faith or a commonplace mistake.

73.     The fact remains that if such a neutral policy, such as the ORC, OAC, and City of Cincinnati requirements, was, in fact, followed, there would be no issue and no petition to the Court alleging hiring discrimination under Title VII. Using arrest records for the purpose of denying minorities the ability to perform jobs is not a new concept and is the basis for Title VII.

Under Ohio Rev. Code 2953.32(C)(2) it is believed that the city of Cincinnati violated 2953.33(A) and 2953.33(B).

*Sealing "restores the person...to all rights and privileges not otherwise restored by the termination of the sentence or community control sanction or by a final release on parole or post-release control" 2953.33(A). Private and public employers, as well as occupational licensing authorities, may not question a person about a sealed adult conviction unless "the question bears a direct and substantial relationship to the position for which the person is being considered" 2953.33(B). In addition, any public employee who discloses a sealed conviction in connection with an application for employment or license is guilty of a misdemeanor, 2953.35; 2953.54.*

74.     Both the City of Cincinnati and the Ohio Department of Public Safety are believed to be in violation of such ORC Codes that limit or cause interference with the hiring process of police officers for the minority community. Under this, there is, again, no substantial relationship for disqualification or denial of services for what Mr. Jones disclosed as the arresting charge and expungement. The functions of LEADS are to maintain the integrity of the database

and to be consistent with Ohio laws. Since Mr. Jones is eligible under Ohio laws to attend police academies, eligible to own firearms, possess a CCW license, and operate a computer, which should have been recognized by the City of Cincinnati, evident by his employment history on his PHQ.

75.     The At-Will doctrine bears no relevance in this stage, as the at-will employee, at-will employee is terminated for the reason that violates a clearly established public policy. Typically, an at-will employee has no greater protection than the right not to be terminated for a discriminatory reason or because their employer is seeking to avoid paying bonuses or commissions.

**Systematic Discrimination**
**Consent Decree**

76.     Outlined in the United States v. the City of Cincinnati, the Consent Decree was to provide a series of "interim measure" numerical hiring and promotional goals regarding Black or African Americans and women. In particular, the Consent Decree established the following numerical goals to be met on an annual basis: (1) **vacancies for entry-level sworn police officer positions are to be filled with qualified applicants in the proportion of, at a minimum, 34% Black or African American** and 23% female; and (2) approximately 25% of vacancies for the police sergeant position are to be filled with qualified Black or African American and female candidates. (Doc.184-1 at PageID 24-25, 28-30.) These two goals are the focus of the United States' instant motion.

77.     According to stats, as of January 2021, CPD's sworn workforce was approximately 28.3% Black or African American. Under the Consent Decree before its termination by the federal judge in 2021, the recruitment numbers of Black candidates were consistently below 34%, as indicated in the bold wording of (1) that outlines vacancies of entry-level sworn police officers are to be filled with qualified applicants. The City of Cincinnati has yet to have a recruiting class of entry-level applicants at 30% Black let alone non-White minorities in general. To suggest that 34% of applicants are not worthy enough to be hired not even one time to become police officers is a bold statement and a testament to how the City views its Black and minority community.

78.     In the 2015-16, 106th recruit class, no official numbers were presented on the internet or from media other than a photo. At the time of this filing, under records request 148154, sent August 8, 2022, official numbers have not been sent for this recruiting class.

Looking at the photo of fifty (50), one is Norwood Police, and one is a fire investigator for CFD. Counted are ten (10) Black or African Americans, assuming all were sworn in as CPD officers. **10 out of 48 for entry-level vacancies was 21%.** The 106th recruit class was 79% Caucasian.

79.     In the 2016-17, 107th recruit class, no official numbers were presented on the internet or from media other than a photo. At the time of this filing, under records request 148154 sent on August 8, 2022, official numbers have not been sent for this recruiting class. A photo of twenty-six (26), which is the number stated on the City of Cincinnati webpage, shows two (2) included Hamilton County Sheriff recruits. By photograph, it appears that there were only three (3) minorities picked by complexion or darker skin color. According to seating, the two (2) pictured in the back, are most likely the Hamilton County recruits. **3 out of 24 entry-level vacancies was 12%.** The 107th recruit class was 88% Caucasian.

80.     In the 2017-18 108th recruit class, no official numbers were presented on the internet or from the media. Photos of the complete class of the 108th could not be located. Records request 148154 has not been met at the time of this filing. According to the City's webpage, thirty-nine (39) officers were sworn in. **Without actual numbers from the city or a photo, it will be assumed that 21% or less was the number of Black candidates, a projection of 8 or 9 Black officers.** It is estimated from previous stats and habits, that numbers were not given when diversity is low and believed that 79% of the 108th was Caucasian.

81.     In the 2018-19, 109th recruit class, no official numbers were present onon the internet or from the media. Photos of the complete class of the 109th could be located on Twitter. According to the City's webpage, forty-two (42) officers were sworn in. Counted were 42, and of those, nine (9) were Black or African American. **9 out of 42 for entry level vacancies was 21%.** Records request 148154 has not been met at the time of this filing. The 109th recruit class was 79% Caucasian.

• Details surrounding Mr. Jones not being considered is also questionable. As discussed earlier, Mr. Jones was an alternate called to fill in vacancies. It was not established whether CPD would take one or two (2) candidates out of the three (3) called to finish the process. Of the 3, 2 possessed related employment as corrections officers, including Mr. Jones. Only 1 had military experience, which was Mr. Jones. Only 1 was a minority, Mr. Jones. One candidate failed the physical assessment test. Of the 2, Mr. Jones was not selected, and he was the only candidate remaining with a law enforcement background, military experience, training in

handcuff and baton usage, and qualified. The candidate chosen had no experience in security and was a first-time applicant with slightly higher test scores than Mr. Jones.

- Mr. Jones was not selected as a recruit for the 109 but knew another Caucasian male he worked with at Warren Correctional Institution. They would discuss the hiring process in the yard when able. CO Johnson was an alternate called to fill vacancies and earned his spot on the roster for the academy. What surprised Mr. Jones was that his test scores were higher than Johnsons'. They discussed the interview process, and Mr. Jones was ranked as "highly recommended" to Johnsons' "recommended." Mr. Jones had more experience in corrections and held other jobs concerning security, which made Mr. Jones more qualified for years of work. Both were service members, with Johnson going full active for some years compared to Mr. Jones's reservist career. Mr. Jones was not even considered until too many departures a week before the academy started. At this point, Mr. Jones was a seven (7) time applicant beaten by first-time applicants. Calls for qualified minorities with military and law enforcement experience echoed the evening news. Under the Consent Decree, qualified minorities should be hired. Only six (6) months later, in January, was Mr. Jones called again and not considered with higher qualifications than the one selected.

82. What is apparent is that the City of Cincinnati boasted that its 110th recruit class was the most diverse class put together. 2019-20, the 110th recruit class consisted of forty (40) members; 30 or 75% were Caucasian, 8 or 20% were Black, and two or .5% were Hispanics. Including all minorities gave the City its highest percentage of minority recruitment at 25%, with Mr. Jones's percentage would have been at 28%. However, according to the Consent Decree, which was still in effect. **8 out of 40 entry-level vacancies for Black/African Americans was 20%.**

83. What is apparent is that until the 111th Recruit Class and perhaps due to multiple complaints by Mr. Jones, the limit of Blacks accepted into the police academy did not exceed 21%. The 111th recruit class consisted of forty-nine (49) members; 35 or 71% were Caucasian, **14 or 29% were Black**. To date, this is the second most Black Americans selected with the highest percentage of minorities selected to the Cincinnati Police Academy. It should be noted that racial breakdown numbers up until the 110th recruit class have not been widely published, and it can be rightfully assumed that the numbers were being hidden. For example, a simple search of the 104th, 2015 Cincinnati Police Recruit Class can be found. Of the 57 officers, 44 men, 13 women; 16 of which were Black. **The percentages were 28% Black** and

72% Caucasian. Even though Cincinnati did not reach 34%, in 2015 it shows a stark contrast between the recruitment numbers from that class to the 111th class.

84.    Looking at issues of lower attendance in the civil service test and/or applications and being at an all-time low. It is rightfully questioned the rise in minority recruitment for the 111th compared to all other classes, except the 104th. The connection, a hypothetical conclusion based on previous situations, seems to be that the City of Cincinnati only hires a larger amount of minorities when there is a a hiring issue. As discussed, Black minorities were given an opportunity after the riots to move on to other sections of the police recruitment process and return to the physical agility test. This decision was to promote diversity. After the hiring freeze and the lateral class of the 103 Recruit Class, CPD was down 150 officers that year. Minority recruiting went up. It will never be determined if complaints are relevant, but what is relevant is that CPD is currently down in numbers again, with an all-time low in applications and test takers. Minority numbers have again gone up. Whether this is hypothetical, it is probable and fits logical deduction.

85.    CPD has, in fact, over the years, hired a low number of minority recruits. This means that a low number is eligible for promotional exams compared to Caucasian members. It would suggest that a higher unfair success rate of Caucasian candidates for promotions over minorities and thus would ultimately lower minorities in the upper chain of command. The City of Cincinnati has not worked on the racial disparity at all. Mr. Jones has, on two (2) occasions, appeared at City Hall Public Safety meetings, once under the Cranley Administration and once under the Pureval administration. Emails to council members under both administrations have been sent since 2019 to the present, requesting a look into hiring practices. While Mr. Jones contends that some officials have discussed and showed a sign of displeasure with the details surrounding this issue, nothing has been done officially to address this issue. Some of the Council members have verbally expressed that City Council has no authority to bring such an issue to the table for discussion. Mr. Jones exasperated all avenues of reconciliation on this matter with the only option of a lawsuit in which legal representation is unavailable because of the complexity of this case.

86.    At the present point in time, there is nothing concrete on how a CPD officer is selected. Suppose test scores, interview rankings, work-related experiences, and times an applicant has tested and passed portions of the process are not considered. This should be a cause for concern, especially if a minority is the greater and not selected.

**Five year racial breakdown of CPD**

87.     In 2015 the racial breakdown of the Cincinnati Police Department as reported by news media, of the 1,012 sworn officers, 676 or 67% were Caucasian, **308 or 30% were Black** and 28 or 3% were classified as "other." If we include Black and others under minorities, then 33% of CPD in 2015 were minorities.

88.     In 2020 the racial breakdown of the Cincinnati Police Department of the 1,057 sworn officers, as reported by news media, 750 or 71% were Caucasian, and **307 or 29% were minority**. According to statistics, the numbers of Black officers did not increase over the five (5) years but Caucasian numbers increased by seventy-four (74) members and the percentage of minorities decreased.

89.     While numerical data alone is not likely to be proof of systemic discrimination, it does serve as an indicator or a red flag that there is a problem. The organizational culture of CPD is dominantly Caucasian. In recent filings over the years, the dominant Caucasian group, the 70%+ has initiated three (3) discrimination lawsuits against minorities the 30% or less. Cases such as the promotion lawsuit brought by Sgt. Koller, who scored four (4) points higher than the minority. Lawsuit filed over usage of the n-word not being handled fairly, in which the officer involved in this case desires to use that derogatory term to refer towards the Black community. Lastly the case against Officer Pettis, brought by 2 Caucasian officers of discrimination and claimed unconstitutional race based policies. This is a sign that the minority population within CPD is under constant attack. The minority community sees and hears these issues and will continue to believe that law enforcement is against the minority community.

90.     In recent news, the suspension of Officer Rose Valentino and Officer Kelly Drach following incidents of racial slur, coupled with the majority filing discrimination against the minority. Inconsistencies within the hiring process, not granting appeals and dismissals for non-disqualifying offenses, coupled with the requirement to shave for Black men who often suffer from pseudo folliculitis barbae, a common inflammatory reaction of the hair follicle, most often on the face as a result of shaving. These are all signs of a system destroying the trust and relationship between the minority community and the police department it is supposed to serve.

91.     Title VII covers discrimination against characteristics that are related to race, like their culture, accent and names. It includes qualities like hair texture skin color and certain facial features like beards. This policy ban affects facial hair in a job setting discriminates against men in certain groups. During the orientation, Mr. Jones heard that shaving will be done and it was

not cared if any person suffered from pseudo folliculitis barbae Lewis v. Univ. of Pa., CIVIL ACTION No. 16-5874, (E.D. Pa. Jan. 29, 2018). As a recruit and Black, you are expected to mare your face, therefore go the extra step to prove worth. This position is a disparity.

92.     The policy of CPD is that plain clothes officers are eligible to wear beards. Therefore there is no legitimate business necessity to deny officers who are supposed to be a reflection of their community a standard that could be used to deter minorities from applying or preceding with hiring. Caucasian officers are not categorized as having this inflammatory issue that causes keloidal scarring from facial hair growth, but 60% of Black/African American men are. The job necessity fails for CPD if any Caucasian Male can wear a beard in any capacity, job title outside undercover work. The organizational culture of CPD, and the policies set by the City of Cincinnati are highly inconsistent with the claims of racial equality. There should be a level and number of discrepancies that should not be considered deviations or mistakes or, categorized as simple incompetence. CPD does not have a culture of welcoming Black candidates.

### Racial Diversity

93.     It should be noted that, "The Cincinnati Police Department's data reveals massive racial disparities in the use of force against civilians, according to                    a group that tracks use of force data. In a press release, "Despite Black people comprising 42% of Cincinnati's population, per 2019 Census Bureau estimates, 73% of the subjects of police use of force between 2017 and 2019 were Black." was the claim of Accountable Now."

94.     The disparity in Cincinnati is greater than Dayton, Cleveland, Indianapolis and seven other cities on the group's website. All cities had a gap of at least 20 percentage points, while Cincinnati had 27 points. Five cities had a larger disparity: Minneapolis, Dallas, Omaha, Orlando and Stockton, Calif. All incidents involving Cincinnati police use of force are                                        that is maintained by the City of Cincinnati.

The database shows that between 2016 and June 29, 2021, 2,212 use of force incidents involving Cincinnati police officers.
- **75% of the subjects were Black**
- 15% of the subjects were juveniles. Census data show 22% of the population of the city is under 18.
- **In 33% of the incidents, the officers were Black.**

- The neighborhoods with the most incidents were Westwood, West Price Hill, Over-the-Rhine, East Price Hill, Downtown and Avondale, but neighborhood data was missing from about a third of the entries.-Accountable Now.

95. According to NBC News, a study was conducted in the journal Science ( ) that analyzed data on nearly 3 million Chicago Police Department patrol assignments. *"They found that compared to White officers, Black and Hispanic officers made far few stops and arrests - and used force less often - especially against Black civilians."*

96. The findings of that study do not contradict the published data from Accountable Now. These studies, show a disparity in treatment of the minority population, which is gravely attributed to the disparity in the hiring process. This issue of limited diversity hiring and the consequences of such should be worthy of the courts time.

## PART X.
### Administrative Appeal

97. It has been touted by a refusing lawyer, that Mr. Jones should had initiated an Administrative Appeal. Suppose Mr. Jones was expected to initiate an administrative before filing the EEOC charge. In that case, it should be rightfully questioned why Mr. Jones would have to resort to going through extra hoops. Any reasonable person could deduct that there is a possibility of adverse action(s) that could be implemented on a hired worker that previously complained about and exposed a potential racial issue within policy. The notion that Mr. Jones was dismissed from the Cincinnati Police process again, not in line with written policy or proper application of the law, is a clear statement of not being wanted. Such adverse challenges to gainful employment should not be an expectation for any qualified person to endure. Mr. Jones believes that if he had litigated to be accepted and go beyond a culture that appears to treat minorities unjustly in the hiring process. That there would be a high probability of unfair biases and treatment against him early in his professional career. The suggestion that an administrative appeal instead of filing discrimination is flawed, and would not address the issues of unfair hiring practices practied against the minority community. This notion is rejected.

## PART XI.
### Claims For Relief
### Count I
#### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C 2000e, et seq.
#### Race Discrimination - Failure to Hire

98.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

99.     Plaintiff Jones, was at all relevant times an "employee" within the meaning of 42 U.S.C 2000e(f). Mr. Jones successfully passed all requirements, was not notified that any issues were outstanding. Mr. Jones was selected not as an alternate, but primary recruit. At no point in time does the documentation presented state Mr. Jones was to be considered a CPD Officer, but documentation does place a reasonable position of acceptance into the 110th Recruit Class with a start date of December 2, 2019.

100.    Defendant Cincinnati, was at all relevant times an "employer" within the meaning of 42 U.S.C 2000e(b).

101.    As a proximate result of Defendant Cincinnati's actions, Plaintiff Jones has been and continues to be damaged in an amount to be determined at trial.

102.    Consistent with 42 U.S.C. 1981a, Plaintiff Jones is entitled to punitive damages because Defendant Cincinnati engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to Plaintiff Jones' federally protected rights.

### Count II.
#### Violation of the Civil Rights Act of the Civil Rights Act of 1871, 42 U.S.C. 1983
#### Equal Protection Clause of the Fourteenth Amendment to the United States Constitution
#### (Race Discrimination - Failure to Hire)

#### By Plaintiff Jones Against
#### Defendants Mai, Bond, and Ross

103.    All preceding paragraphs are incorporated by reference as if fully restated in his paragraph.

104.    Plaintiff Jones was at all relevant times a "citizen of the United States or other person within the jurisdiction terror" within the meaning of 42 U.S.C 1983.

Defendants Mai, Bond, and Ross were, at all relevant times, "person(s)" within the meaning of 42 U.S.C 1983 because they are sued for prospective inductive relief in their official capacities and for money damages in their individual capacities.

105.     Defendants Mai, Bond, and Ross acted under color of a statue, ordnance, regulation, custom, or usage of the State of Ohio and deprived Plaintiff Jones of his rights, privileges, or immunities secured by the federal Constitution or federal law when they refused to hire him because of race. Alternatively, Plaintiff Jones' race was a motivating factor in their decision to refuse to hire him.

106.     As a proximate result of Defendants Mai, Bond and Ross, Plaintiff Jones has been and continues to be damaged in an amount to be determined at trial.

107.     Plaintiff Jones is entitled to punitive damages because Defendants Mai, Bond and Ross were motivated by intent or acted with reckless or callous indifference to Plaintiff Jones' federally protected rights.

### Count III.
#### Violation of Ohio Revised Code Sections 4112.02 and/or 4112.99
#### (Race Discrimination - Failure to Hire)

#### By Plaintiff Jones Against Defendant Cincinnati

108.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

109.     Plaintiff Jones was at all relevant times an "employee" within the meaning of Ohio Revised Code Section 4112.01(A)(3).

110.     Defendant Cincinnati was at all relevant times an "employer" within the meaning of Ohio Revised Code Section 4112.01(A)(2).

111.     Defendants,  Cincinnati violated Ohio Revised Code Sections 4112.02 and/or 4112.99 when it refused to hire Plaintiff Jones because of his race. Alternatively, Plaintiff Jones race was a motivating factor in the decision by Defendant Cincinnati to not hire him.

112.     As a proximate result of Defendant Cincinnati's actions, Plaintiff Jones has been and continues to be damaged in an amount to be determined at trial.

## Count IV.
### Violation of Ohio Revised Code Sections 4112.02(J) and/or 4112.99
### (Aiding and Abetting Unlawful Discrimination)

### By Plaintiff Jones Against
### Defendants Mai, Bond, and Ross

113.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

114.     Plaintiff Jones was at all relevant times an "employee" within the meaning of Ohio Revised Code Section 4112.01(A)(3).

115.     Defendants Mai, Bond, and Ross were at all relevant times an "person(s)" within the meaning of Ohio Revised Code Section 4112.01(A)(1).

116.     Defendant Mai, Bond, and Ross violated Ohio Revised Code Sections 4112.02(J) and/or 4112.99 when they aided, abetted, incited, compelled, or coerced the unlawful discrimination against Plaintiff Jones, set forth in this Complaint.

117.     As a proximate result of Defendants Mai, Bond, and Ross' actions, Plaintiff Jones has been and continues to be damaged in an amount to be determined at trial.

## PART X.
### Promissory Estoppel

118.     Mr. Jones was presented with a list to buy specific items for the start of the academy. Mr. Jones underwent the uniform fitting process and obtained all items required to start the academy. To reiterate, Mr. Jones had completed all portions of his background recruit process from medical, psychological, interview, etc.,. The preponderance of evidence highly suggests that the City of Cincinnati and its police department had the duty to initiate the appeal process. Based on years of background checks, the logic to deny is questionable as nothing disqualifying was produced during his background check. The fact that the City would not have spoken for Mr. Jones during the appeal process and the fact(s) surrounding reinstatement, which include no finding of guilt for the arrest, is highly unethical for the denial to initiate the appeal process. The City of Cincinnati stance is strictly that a third party made the decision and initiated the discriminatory actions against Mr. Jones. According to the email between Bond and Joseph, the City allowed Mr. Jones to continue paying out of pocket for medial procedures required to pass to attend the academy. There is no legitimate reasonable doubt that can be offered to why Mr. Jones was allowed to continue in the process, to why he could attend the orientation with

continued payments for procedures and supplies if it was determined that he was ineligible for consideration. The sole claim that the City had hands tied, is not relevant and is not justifiable.

119. Promissory estoppel is a doctrine in contract law that stops a person from going back on a promise even if a legal contract does not exist. It states that an aggrieved party can recover damages from a promisor if the damages incurred were the result of a promise made by the promisor, which the receiver of the promise relied on to his subsequent detriment.

120. Although a promise must be supported by a legal consideration or a legal agreement to be enforced, the doctrine of promissory estoppel allows the promise to be enforced even though the requirements of a valid contract are not present.

121. The following elements must be present for the doctrine of promissory estoppel to be enforceable:

1. Promisor made a significant promise to cause the promise to act on it.
   1. The first element of promissory estoppel is that the promise made to the promisee was significant enough and that a reasonable person would ordinarily rely on it. Mr. Jones and the rest of the recruits were told they had the position unless they were willing to relinquish their position to any recruit sitting behind them at the last table in the back. It was clearly stated that the academy was available, graduation and the badge was not and had to be earned. There is no doubt that Mr. Jones fully believed that he would attend the academy starting on December 2, 2019.
2. Promisee relied on the promise.
   1. The second element is that the promisee must have acted on the promise made by the promisor, even though it was not supported by consideration. The fact that Mr. Jones voluntarily quit his job of 5 years with ODRC is proof that he acted on the promise that he was to attend, especially since all portions of his background was completed.
3. Promise suffered significant damage by relying on the promise.
   1. The third element is that the party relying on the promise suffered an actual detriment in the form of an economic loss. The loss results from the promissory failing to deliver on the promise made at the start of the relationship. In simple terms, the promisee is in a worse position for having acted on the relied on the

promise. Mr. Jones incurred medical costs at his detriment. He also bought all the supplies as directed by officers at the academy. He again was unaware that he would be facing disqualification and denial based on what the law required, the fact that he was reinstated and the fact that he left court documentation in the hands of the Commission. Mr. Jones also lost benefits, job, seniority, and had to take money out of his retirement due to no job and the start of COVID. Mr. Jones contends that if the August 30, 2019, email was used to justify a disqualification, Mr. Jones should had been aware of such before the start of the academy in December. Itemized list details the financial loss (**exhibit GG, medical bills and statements are available**).

1. Medical expenses total in the amount of $956.26.
2. The total for academy supplies includes computer for training for $1,557.53.
3. Comp time lost/claimed 99.65 hours in the amount of $2,205.25
4. Vacation time lost/claimed 203.02 hours in the amount of $4,492.61
5. Personal leave lost/claimed 10 hours in the amount of 203.01
6. Sick time lost/claimed 11.06 hours in the amount of 137.98
7. State Corrections Salary of $46,030.40
8. Family insurance not calculated
9. Retirement withdrawn in the amount of $29,091.61
10. Loss of step increase 3/17/2020 not calculated
11. Total amount from numbers not including step increase and family insurance, Mr. Jones suffered $82,022.88 in financial loss in the least.

122. The three main components needed for promissory estoppel are **the promisor, the promisee, and the promise that wasn't honored**. The injustice happens when the promisee suffers a loss when he relied on the promise, which wasn't kept. Therefore, Mr. Jones believes that this case has established promissory estoppel.

123. For instance, in Hedrick v. Ctr. for Comprehensive Alcoholism Treatment, 7 Ohio App. 3d 211, 214, 454 N.E.2d 1343 (1st Dist.1982), the First District, quoiting the Ohio Supreme Court stated:

*Promissory or equitable estoppel arises when " \* \* \* 'one, by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist, and such other rightfully relies and*

*acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.*

124. And the Sixth District has observed:

*In essence, the expression of estoppel in the form of a rule is that one party will not be permitted to deny that which, by his words, his acts, or his silence (when there was an obligation to speak), he has induced a second party reasonably and in good faith to assume and rely upon to that party's prejudice or pecuniary disadvantage.*
*(Emphasis added.) First Fed. Sav. & Loan Ass'n of Toledo v. Perry's Landing, Inc., 11 Ohio App. 3d 135, 145, 463 N.E.2d 636 (6th Dist.1983), citing 42 Ohio Jurisprudence 3d 56, 62-66, Estoppel, Sections 36-46. See also, Nilavar v. Osborn, 127 Ohio App. 3d 1, 17, 711 N.E.2d 726 (2d Dist.1998).*

125. Mr. Jones would like to inform the Court that on August 18, 2022, an Administrative Technician from Recruiting and Background Investigations sent Mr. Jones an email, asking him if he would be interested in participating in the 114th Recruit Class. Mr. Jones does find this highly impractical, that he would be contacted if there was disqualifying criteria, that would prevent hime from admittance into the academy.

126. According to the Ohio Department of Public Safety on page 5, last sentence, it reads;

*"If circumstances have changed, or if, as it appears, Charging Party (Mr. Jones) is primarily concerned about what may happen should he apply for a law enforcement position again, and his prospective employer makes a LEADS access inquiry when those records are no longer on his criminal history, then that concern exceeds the scope of the charge." - August 11, 2021*

127. Since nothing has changed, other than BCI finally taking care of an issue over 14 years old and an expungement for the 2003 arrest in which Mr. Jones was the victim with a dismissed case, the fact remains that there were no convictions of disqualifying offenses. And all parties knew there were no convictions and therefore there should had never been a denial. On the surface it appears that the Ohio Department of Public Safety is trying to walk back discriminatory actions and Cincinnati, who knows of Mr. Jones' displeasure in the process is attempting to restore some good faith years after being shunned and convicted without a conviction.

## PART XI
### Prayer For Relief

128.    Wherefore, Plaintiff request judgement in his favor on all claims in the Complaint and request the following relief:

A.  Economic compensatory damages in an amount to be determined at trial;

B.  Non-economic compensatory damages in an amount to be determined at trial;

C.  Liquidated, treble, punitive, or other exemplary damages in an amount to be determined at trial;

D.  All costs and expenses incurred in pursuing the claims against Defendants;

E.  Pre and post judgment interest; and

F.  All other legal and equitable relief this Court and/or jury determine is appropriate.


## PART XII
### Jury Demand

129.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff's demand a trial by jury on all claims and issues that are triable.


## PART XIII
### Conclusion

130.    Mr. Jones a seven (7) time applicant who has been dismissed under precarious circumstances was told by many that his chances of becoming a CPD Officer would be slim to none based on his race. Yet Mr. Jones continued to try to earn the badge, but continuously was denied, not in lines with written policies. Eventually, he made it, and there was a sense of joy and purpose for his life as he felt that an officer's job was a calling he needed to answer.  Coworkers congratulated Mr. Jones on his success combined with expressions of joy from his family, and it was a heartfelt situation. Mr. Jones finally made it, his perseverance paid off. The loss of the position has not been easy for Mr. Jones. Depression and animosity set in that he cannot wear the uniform because of the unfair requirements placed upon Black applicants. Mr. Jones had to realize that all his years of trying were for nothing, all his years of training were for nothing and there is a type of void.  The mistakes outlined here, seem to only affect one class of people, unintentional or not. According to the Ohio Department of Public Safety, who blames CPD for not initiating the appeal, the sentiment is that Mr. Jones is now eligible for CJIS access, which is required to do the job of an Ohio Peace Officer. Both agencies point to the arrest and not the disposition, and if they had followed the law, and the policies outlined, there would had been no case and no denial. However, nothing has changed. The facts are, Mr. Jones was eligible in 2007

and was eligible and qualified in 2019, just as he is eligible in 2022, especially with the request of the City to start the application process because of a shortage in applicants.

131.    The laws are not here to be applied to a certain few under different circumstances and job titles. Yet, at every turn the City has either ignored written agreements it has entered into, ignored the proper application of the law, tried to influence a decision by painting Mr. Jones as a convicted offender, and treated him as a lesser than others. The recipe for discrimination is present.

132.    It is believed that this case is not frivolous and does have merit. It is believed that the city of Cincinnati does not have a clear response to these allegations evident by the previous filings of blanket statements that lead to dismissals filed previously with the EEOC and OCRC. Request for summary judgement is believe without merit if the City bases its claims on dismissals of the initial EEOC case or any other investigation into their actions. It is believed that the investigators of this issue are not knowledgable of the laws and Court interpretation is required.

133.    Requesting punitive damages in the full amount of $300,000 under Title VII. Mr. Jones will never wear the uniform of a CPD Officer and is considered too old, with age above 35, which is age limit cap for all entry level police candidates outside of major Ohio metropolitan cities. Mr. Jones is seeking compensatory damages in the least, valued at twenty-five (25) years of an CPD officer's salary that ranges from $65,867.12 to $80,355.96 annually plus retention bonus touted by the City of Cincinnati, in the least or any amount greater. Emotional damages, since Mr. Jones underwent depression after being denied and the fact that he was and currently still is unable to find any career work in his desired field of choice, in the city where he lives, in the amount of applicable taxes. Mr. Jones is also requesting the $82,022.88 suffered in losses.

Respectfully submitted,

By: __Jonathan A. Jones_____

Pro Se
1831 Berkley Ave,
Cincinnati, OH 45237
Telephone: 513.349.0625
j.appleseed.34@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on _____ _____, 20____, I mailed my
Motion of Title VII Hiring Discrimination to the Clerk of Courts for filing. Upon
the Clerk's Officer docketing of this [leading, notice of this filing will be sent
through the Court's electronic filing system to all parties represented by attorneys
who are registered users of the Court's electronic filing system as provided for in
Fed.R.Civ.P.5(b)(2)(E).

A copy of this pleading will be mailed, by ordinary United States Mail, postage
pre-paid, to the following unrepresented party/parties this same day:

City of Cincinnati C/O Andrew Garth
Cincinnati City Attorney
801 Plum St., Suite 214
Cincinnati, OH 45202

Lauren Creditt Mai C/O Andrew Garth
801 Plum St., Suite 214
Cincinnati, OH 45202

Sheila Bond C/O Andrew Garth
801 Plum St., Suite 214
Cincinnati, OH 45202

Bruce Ross C/O Andrew Garth
801 Plum St., Suite 214
Cincinnati, OH 45202

Jonathan Jones
Pro Se Plaintiff

**Page 43 of 43**

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Indianapolis District Office**
101 West Ohio St., Suite 1900
Indianapolis, IN 46204
(317) 999-1178
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 07/07/2022

To: Mr. Jonathan Jones
1831 Berkley Ave.
Cincinnati, OH 45237

Charge No: 22A-2021-01911

EEOC Representative:        Jeremy Sells
State, Local & Tribal Coordinator
(463) 999-1161

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

The EEOC has adopted the findings of the state or local fair employment practices agency that investigated your charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By: Michelle Eisele  07/07/2022
Michelle Eisele
District Director

Please retain this notice for your records.

cc: On following page

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice.** Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 22A-2021-01911 to the District Director at Michelle Eisele, 101 West Ohio St., Suite 1900, Indianapolis, IN 46204.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to:
https://www.eeoc.gov/eeoc/foia/index.cfm.